Baldwin, J.
By the true construction of the lease between the heirs of Rush and the appellee Moyers, the latter was to be entitled to a waygoing crop, whether the term should expire by efflux of time, or at the end of a previous year, by reason of the event contemplated and provided for by the parties. This is apparent from the stipulation, that Moyers was not to farm “ more than one half of the cleared land in a year,” and that “at any time he should give up the land, the one half was to be clear,” (that is, of a crop) “ and ready for tillage.” This stipulation could only have been founded upon the understanding that the tenant was to have the privilege of sowing a fall crop in one half of the cleared land, the last year of his term ; for, as the term was not to expire, in any event, until the first of April, and the tenant was inhibited from cultivating more than one half of the cleared land at all in any one year, it follows that without such privilege the tenant would have had no benefit from the lease; *612 inasmuch as the inhibition would have prevented him from cultivating one half the cleared land, and the danger of not reaping what he might sow the other also: unless we suppose that the parties fell into the abgur(j¡iy 0f providing that there should be no fall crop in the moiety which the tenant was not to cultivate at all. This construction of the lease is fortified by the circumstance that there was a fall crop in the land, belonging to previous tenants, at the commencement of the term, and by the pleadings in the cause; both bill and answer tacitly taking for granted the privilege of a fall crop under the lease, if the premises had not been sold under the decree.
By the sale under the decree, the purchasers Mason and Short acquired a title to the premises paramount to that of the lessors the heirs of Rush, and a right to the immediate possession, but none to the rent. The effect of the sale would have been to abrogate the lease and exonerate Moyers the tenant from the rent in question, but for the stipulation that the tenant was to surrender possession at the end of the year in which such a sale should be made; by force of which the lessors were bound to assure to the tenant the enjoyment of the premises for that year of the term. If Mason, one of the purchasers, had done this for himself and his co-lessors, the tenant would have been bound to the lessors for the rent of that year. But this he did not do. On the contrary, his copurchaser and coappellant Short prohibited Moyers from putting in a fall crop, and by the pretensions of both Mason and Short in regard to the crop of corn and oats, they asserted their right to the immediate possession of the premises. That right they did not enforce by an ouster of the tenant; but their right to reap the waygoing crop, in the event of its being put in by Moyers, they could, and, the evidence justifies the belief, would have enforced; and he acted discreetly in declining to give them an opportu *613 nily of doing so. Under these circumstances, they J 1*^1 . i were not warranted in afterwards assuming towards Moyers the relation of landlord, for the purpose of coercing payment from him of the rent in question. If he could have defended the attachment on the ground that they were not his landlords, (as to which I express no opinion) and thereby defe'ated the recovery of the whole year’s rent, he was not bound to do it. It was competent for him to place his defence upon the just and equitable ground that he was entitled to an apportionment or abatement of the rent. That was a defence which he could not make at law, in any form, or by any mode of proceeding, there not having been an actual eviction; and it could only be asserted in a court of equity. And the evidence in the cause is sufficient to justify the allowance that has been made of 200 dollars, as the fair and reasonable abatement of the rent.
I am therefore of opinion that there is no error in the decree of the circuit superior court affirming that of the county court.
Allen, J.
It was held in Harris v. Carson, 7 Leigh 632. that where land was leased for a fixed and determinate period, the offgoing tenant was not entitled in virtue of any supposed custom to the waygoing crop. The tenant, in the case under consideration, claims relief in consequence of his being prevented from putting in a crop, which he could not have reaped until after the determination of his term. Unless such a right was secured to him by the contract of lease, the ground upon which his claim rests will fail him. By the contract, he rented from the heirs of Rush a farm for three years at the annual rent of 300 dollars, the term to commence on the 1st of April 1824. The lease was of an improved farm, and for cultivation ; the tenant being restrained from cutting timber except for fire *614 wood and repairs. At the commencement of his term, a Por^on °f the land was in crop; for a privilege is reserved to the previous tenants to use the barn to get out their grain “ then sowed on said land.” The land ¡g situate(j ¡n a quarter of the state where small grain is the principal crop. And as it appears that the previous occupants had the privilege retained to them to secure their crop growing in the spring of 1824, when the term commenced; unless the tenant was entitled to the waygoing crop, he would have bound himself to pay a money rent of 300 dollars annually for three years, and have been entitled to but two crops of small grain from which to make it. Such a contract would have been unequal; and though it was competent for the parties to enter into it, the circumstances are entitled to some consideration in ascertaining the meaning of the terms actually contained in the written agreement. If the terms of the contract left the intention of the parties in more doubt than I think they do, those circumstances might tend to shew that the parties contracted in contemplation of the right of the tenant to take three crops in consideration of the three years rent. But it seems to me the words of the agreement can only be satisfied by the recognition of such a right. The lease restricts the tenant from cultivating more than one half of the cleared land in any one year; and then provides that at any time he should give up the land, the one half was to be clear and ready for tillage. Though the writing speaks of his giving up the land at any time, a previous part of it explains this, and shews that by this phrase the parties meant, at the end of any one year of the term, and not at any time within a year. Reference was made to a suit then depending to subject the land to sale, which might put an end to the lease before the three years expired; and it was provided that in the event of a sale, the lessee was to give up the premises at the end of the *615 year he should receive notice. So that whether he held on to the end of the term or not, neither party contemplated a surrender of Lhe possession at any other lime than the 31st of March. The phrase “ clear and fit for tillage” can only refer to the ground being in crop: for the land was all cleared. The agreement to have one half clear and fit for tillage must mean, free from crop; and free from crop on the 1st of April of each year: thereby distinctly recognizing the right to have the other half then in culture. At that season of the year and in that country, the only crop which could have been in the ground, according to the ordinary course of husbandry,.was the crop of small grain put in the preceding fall. If the contract recognized the right to sow, the right to reap would follow. And in this mode the tenant would be entitled to take the three crops, for which he was to pay the three years rent. The parties themselves, in the pleadings, appear to have put this construction on the contract; for the defendants do not, in their answers, deny the right of the tenant to the waygoing crop, but contend that they did not interfere with the enjoyment of it.
But if by the agreement the plaintiff was entitled to the waygoing crop, the next enquiry is, what has prevented him from enjoying it? He remained in possession until the end of his term. It was in his power to have sowed, and it would have been soon enough to have complained when the defendants should have actually interfered to prevent him from reaping. This objection, at first view, seemed to be conclusive; and I was inclined to think that whatever loss the tenant may have sustained, it resulted from his own omission, and he was entitled to no redress. A more careful attention to the facts in the record has satisfied me that this impression was incorrect. If there had been no change in the relation which the parties bore to each other, and the original lessors or their assignees had *616 remained the landlords, the objection would have been decisive against the plaintiff! For though the landlord, differing in opinion with the tenant as to the correct construction of the lease, might have warned him not t0 S0W) ancj dec]are¿ that if he did he should not reap, such a declaration, not accompanied by any act disturbing the tenant during his term, would have furnished no ground of complaint, much less a foundation on which to lay a claim for damages. But the relation of landlord and tenant according to the terms of the original agreement did not continue. When the lease was made, the parties to it contemplated the probability of the term being terminated before the three years expired, and they provided for that event. In fact it was so terminated ; the land was sold under a decree, and the defendants were the purchasers. The lease was made pendente lite, and the purchasers came in under a title paramount to that of the tenant. As purchasers they had a right to the immediate possession, unless, indeed, the decree contained some provision to protect the tenant; and that does not appear, nor is it pretended. The tenant, as against the purchasers, claiming in that character and not as assignees in fact or in law of the lessors, could assert no right under his agreement with the lessors. He became a mere occupier of the premises at the will of the purchasers, liable to be turned out at any moment. Under these circumstances he could not safely do any act against their consent. Though his construction of the agreement was correct, and, so far as his immediate lessors were concerned, he could have ,asserted his rights against them; against the defendants, purchasers of the property, it would have afforded him no protection. The tenant, in this state of things, called on the defendants immediately after their purchase, to know what he was to do. Then was the time, if the purchasers intended to permit him to hold according to the terms of the *617 lease, to have announced their determination. But this was not done. They both warned him not to sow a fall crop, declaring that if he did they would reap it. One of the joint purchasers admits in his answer that they asserted their right to possession, and alleges an agreement with the plaintiff, that he was to go on with the fallowing; that they the purchasers would put in the fall crop; and that the plaintiff, instead of the 300 dollars rent, should only pay one third of the corn and oats. Such an agreement is not proved; but the allegation in the answer shews that they disavowed at that time the contract of lease, and insisted on their superior right to the possession. The tenant had made preparations for putting in the crop, but was prevented from doing so by the declarations of the defendants. Under the circumstances it was his duty not to seed against their consent. The land was theirs, and they had the right to the immediate possession, and to put in the fall crop themselvés, as they asserted their intention to do. For some reason not appearing, they failed to put in the crop themselves, and when the term had nearly expired, they assumed the character of landlords, and claimed the benefit of the contract, although they had repudiated it in the first instance, and so deprived the plaintiff of the advantage he might have derived from it.
In this proceeding their conduct was oppressive. In fact they were not entitled to any portion of the rent reserved by the agreement. But the plaintiff acquiesced in their claim, either because he supposed it to be just, or because he thought that as purchasers they occupied the position of the original lessors. Acting under the mistaken impression that they were entitled to a portion of the rent reserved, he could not have defended himself on the trial of the attachment as to the residue, for it was not a case for apportionment, as there was no eviction from a part of the demised pre *618 mises. It is indeed very questionable whether at law he 001)]^ have made any defence. The common law writ of replevin, if it could have been maintained in such a case, was abrogated by the act of 1S23. And the act of 1819 speaks of the writ of replevin only in cases where goods are distrained for rent. In Redford v. Winston, 3 Rand. 148. two of the judges thought that replevin, either at the common law or under the statute, did not lie in the case of an attachment, and a third considered the question as of little consequence since the act of 1S23; from which it may be inferred that he did not suppose it would lie under the statute, as that act merely abrogated the common law remedy. The case of Redford v. Winston decided, that as the law then stood, the tenant was precluded from making any defence which might call in question the truth of the landlord’s oath; and one of the judges remarked, that for any wrong thereby done to the tenant, he was left to his action at law, or bill in equity to slay proceedings. The act of 1S27 permits the tenant to appear and contest the landlord’s right to sue out such attachment; and provides, that if it shall be made to appear that the lessor had no just cause to suspect the tenant would remove, the attached effects shall be restored. As the restoration of the attached effects in one aspect of the case, and the order of sale in the other, are the only proceedings prescribed, and there is no provision for ascertaining the amount of rent, it would seem that the landlord’s grounds of suspicion that the tenant will remove can alone be contested under this act.
But it is unnecessary to pursue this matter farther, or give any definite opinion upon it. In this case there was no eviction from any part of the demised premises, and there could therefore be no apportionment at law. And if the tenant could have appeared and defeated the whole claim by shewing that the defendants were *619 entitled to no portion of the rent, it is not for them to object that he has failed to do so, by acknowledging that they were entitled to a part of the rent, the effect of which acknowledgment was to deprive him of a legal defence as to the residue.
Nor do I conceive that this is an attempt to recover unliquidated damages in equity. The defendants, as purchasers, were not bound by the agreement. The plaintiff could maintain no action on it against them for any breach of the covenants. And since they had, as purchasers, a right to immediate possession, he could not have sued them for the exercise of it. If, after they had asserted a claim to the whole rent reserved by that agreement, they might be considered as having recognized the obligation the agreement imposed upon them, it is still not very apparent how the tenant could have proceeded against them at law. It seems to me, that he has pursued the only course which afforded a certain and adequate remedy, and that under the circumstances it was a proper case for the jurisdiction of a court of equity, to make a proper and just abatement, after the tenant admitted his liability as to part.
The evidence is satisfactory to prove that the abatement made was no more than he was justly entitled to.
I think, therefore, that both decrees were right and should be affirmed.
Brooke, J.
There is some difficulty, on the pleadings in this case, in ascertaining whether the defendants Mason and Short are to be treated as purchasers under the decree for the sale of the land, or as landlords according to the lease. If they are to be treated as purchasers under the decree, they certainly could not sue out the attachment on the ground that the tenant was about to remove his effects and leave the state. If they are to be treated as landlords and entitled to sue out an attachment, surely the plaintiff might *620 at law, on the return of the attachment, have proved that he did not intend to remove his effects and leave the state, and that there was no ground for the charge, and have quashed the attachment. But the main charge in the bill is, that as tenant he was prevented from sowing a fall crop. If so, and he was entitled under the lease to sow the fall crop to be reaped the next summer, the injury could only be redressed by recovery of damages at law, and of consequence he could not come into the court of chancery. But was he entitled under the lease to sow a fall crop to be reaped the next year ? His term was to end the April following, and I see nothing in the lease which entitled him to sow a fall crop to be reaped after that period. Harris v. Carson, 7 Leigh 632. As to understanding the lease differently by inferences from circumstances not found in it, (for example, the circumstance that the preceding tenants were allowed to sow a fall crop) I cannot think that such circumstances are to be looked to for any such purpose. Nor do I think that the tenant’s being only allowed by the lease to cultivate half the cleared land gave him a right to sow a fall crop the last year of his term. If the lease permitted him to sow only two fall'crops in the three years, he may have made a bad bargain, but I do not think I can make a better one for him upon inferences not warranted by the terms of the lease. But how was he prevented from sowing the fall crop the last year of his term ? There is not proved any act of the defendants to prevent him. It is true there is some evidence that he was warned by the defendants not to sow a fall crop which he would not be permitted to reap; but whether this warning was given in the character of landlords or of purchasers does not appear.- It could not be in the character of landlords, as, though one of the purchasers, James Mason, was one of the lessors, he was united in the lease with several others, who are not parties in the case, *621 and he alone was not authorized to warn the plaintiff off the land. It appears to me, the tenant might have had other motives for declining to sow a fall crop. He may have been advised that his lease did not allow him to do so; as he remained on the land till the end of his term. I think that according to the correct construction of the lease, the tenant was not authorized to sow a fall crop the last year of his term, though he was bound to pay the rent: but if he was so authorized, he might have defeated the attachment at law by shewing that the defendants were not his landlords, and also have recovered damages for the seizure of his property. It is said he only wanted an apportionment of the rent, and for this he must come into the court of chancery. But his bill is only against the defendants as purchasers, and only one of them was a lessor. As purchasers, there is nothing in the record to entitle them to the rent under the lease. On that ground the decree is wrong. To apportion the rent, the court ought to have had before it all the lessors of the plaintiff, or their representatives, in order to ascertain what portion of the rent was due.
On these grounds I think the decree ought to be reversed ; first, because, if the defendants are to be treated as purchasers, the remedy of the plaintiff was at law for the wrongful distress of his property; secondly, because, if they are to be treated as landlords, they alone were not entitled to seize the property of the tenant, not being entitled to the lease.
Decree affirmed.